SAMUEL THOMAS WRIGHT,

                Plaintiff,

-vs-                                          Case No. 6:07-cv-2039-Orl-19KRS

DUANE S. BURKHEAD,

                Defendant.

## ORDER

This case comes before the Court on the following:

1. Motion for Summary Judgment by Defendant Duane S. Burkhead (Doc. No. 39, filed Mar. 12, 2009);

2. Notice of Filing Documents in Support of the Motion for Summary Judgment by Defendant Duane S. Burkhead (Doc. No. 41, filed Mar. 13, 2009); and

3. Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment by Plaintiff Samuel Thomas Wright (Doc. No. 44, filed Apr. 1, 2009).

### Background

**I.  Facts in the Light Most Favorable to Plaintiff**

On the evening of April 22, 2005, Defendant Duane S. Burkhead, a deputy sheriff with the Orange County Sheriff's Office ("OCSO"), was part of a prostitution decoy operation in southwest Orlando. (Doc. No. 41-3 at 9, 18-19, 23.) The operation involved a female undercover officer posing as a prostitute. (*Id.* at 18-19.) Officers hidden nearby arrested persons who solicited the undercover officer for prostitution services. (*Id.*) Participating in this operation were uniformed

officers in marked cars who made the actual arrests, a plainclothes officer in charge of the female undercover officer's safety, and plainclothes booking officers responsible for filling out the paperwork and processing the arrested persons. (*Id.* at 19; Doc. No. 41-2 at 60.) Burkhead was working in the booking section of the operation. (Doc. No. 41-3 at 19.)

That evening, Plaintiff Samuel Thomas Wright left the Florida Mall and headed north on South Orange Blossom Trail towards State Road 408 to drive to his girlfriend's home in Ocoee. (Doc. No. 41-2 at 45.) Around 8:00 P.M., Wright pulled into Michael's Auto Recycling on South Orange Blossom Trail near Indiana Street because he was considering going to Cleo's Night Club across the street. (*Id.* at 50, 55.) He parked in order to call some friends to see if they wanted to go to the club with him. (*Id.* at 56.) As he was pulling into the lot, Wright noticed marked police vehicles on a side dirt road and a female posing as a prostitute on a nearby corner. (*Id.* at 51, 54.) From this, he deduced that the police had set up a prostitution sting operation. (*Id.* at 51.)

Wright remained in his car, parked in the lot across from Cleo's, for about thirty minutes. (*Id.*) During his deposition, when asked why he stayed in his car for that length of time, Wright responded that he wanted to observe police procedures to gather information to support a potential claim against officers for a previous arrest: "I was watching a prostitution sting across the street to see if they were pulling their guns on anyone else they arrested – as they pulled their guns out on me – so I could relay that information to my lawyer." (*Id.*) Wright believed that he previously had been "set up" in a similar prostitution sting operation and "wanted to see if the officers pulled their guns." (*Id.* at 51-52, 59.)

After some time, the female undercover officer notified her safety officer that there was a suspicious person sitting in a vehicle across the street. (Doc. No. 41-3 at 19.) The safety officer

brought this to the attention of Burkhead's supervisor, Sergeant Rich Walker. (*Id.*) Walker was in the booking area at the time with Burkhead and said to Burkhead, "let's go, get in the car." (*Id.*) Burkhead and Walker drove over to the location of the vehicle identified by the female undercover officer. (*Id.*) As he neared the vehicle, Burkhead observed a man in the car whom he later discovered was Wright. (*Id.* at 19-20.) At the time, both officers were in plainclothes, and Burkhead was wearing an OCSO badge and a vest that had the word "sheriff" on it. (*Id.* at 20.)

Once Burkhead and Walker reached Wright's vehicle, they parked and approached the vehicle on foot. (*Id.*) Burkhead walked up to the driver's door, and Walker approached the passenger's door. (*Id.*) Wright rolled down the driver's window. (*Id.* at 100-01; Doc. No. 41-3 at 21.) Although not mentioned during his deposition, in a later-filed affidavit Wright explained that "[t]he two deputies surrounded my car, and ordered me to roll down my window." (Doc. No. 44-2 at 1, ¶ 3.) Wright stated in his deposition that "two plainclothes officers came over, started harassing me, what am I doing, do I have ID, asking me, just, harassing-type questions." (Doc. No. 41-2 at 70.)

According to the deposition of Burkhead, Wright "was answering the questions" and "didn't refuse to answer anything." (Doc. No. 41-3 at 21.) While Burkhead was questioning Wright, Walker was peering into Wright's vehicle and shining his flashlight into the interior of the car. (*Id.* at 67-68.) After less than a minute had passed, Walker said "gun" to alert Burkhead to the presence of a firearm in the vehicle. (*Id.* at 21, 66.) According to Wright, Burkhead "pulled his gun, put it in my face, yelling at me to, you know, get out of my Explorer."[1] (Doc. No. 41-2 at 71.) Burkhead asked Wright if he had identification and a gun permit, and Wright gave the officers his Georgia

---

[1] Burkhead denies pulling a gun on Wright. (Doc. No. 41-3 at 22.)

-3-

concealed weapon permit. (*Id.*) Burkhead responded, "it looks like a fake; and even if it was real, it's not valid in the State of Florida."[2] (*Id.*) Burkhead then secured Wright by putting handcuffs on him and placing him in the back of the unmarked police vehicle. (*Id.* at 50, 71; Doc. No. 41-3 at 22, 24.)

Wright stated that "[t]he officer on the passenger side saw I had my gun on the floorboard of the – of the Explorer in plain view, I would say, if he saw it." (Doc. No. 41-2 at 50.) He described the gun as being "right there in between the driver's seat and the passenger's seat, forward but down."[3] (*Id.* at 60-63.) It was in a holster, loaded, without the safety on. (*Id.* at 64-65.)

Burkhead took Wright to the booking area and began processing him. (Doc. No. 41-3 at 23.) Wright gave Burkhead his Florida identification card, his Georgia driver's license, and his Georgia gun permit. (*Id.* at 24-25; Doc. No. 41-2 at 71.) As reported by Burkhead, Wright stated that he lived in Orlando on Grant Street and had been there for about six months. (Doc. No. 41-3 at 26, 30; Doc. No. 41-4 at 1.) Burkhead charged Wright with carrying a concealed firearm in violation of § 790.01(2), Florida Statutes (2005). (Doc. No. 41-4 at 1.) Wright remained in jail for approximately twenty-four hours and was bailed out by his girlfriend. (Doc. No. 41-2 at 75.) The charges against Wright were eventually dropped. (*Id.* at 76.)

---

[2] Burkhead stated that the gun permit provided by Wright "did not have a photograph on it," was "flimsy," looked like it had been "laminated . . . at Wal-Mart or K-Mart," had "no rigidness," had uneven edges, and "was just like a piece of paper like somebody cut it out with a pair of scissors." (Doc. No. 41-3 at 26-27, 52, 57.)

[3] Burkhead described the gun as being "[u]nderneath the driver's seat." (Doc. No. 41-3 at 64.) According to Burkhead, the handle of the gun was sticking out from under the seat and was readily accessible to Wright from his seat in the car. (*Id.* at 64-65.)

## II.     Procedural History

Wright brought this action against Burkhead in his individual capacity in state court, and Burkhead subsequently removed the case to federal court. (Doc. No. 1, filed Dec. 28, 2007.) In the Amended Complaint, Wright states that Burkhead seized him in violation of the Fourth Amendment to the United States Constitution. (Doc. No. 31 at 2, ¶ 14, filed Feb. 20, 2008.) Specifically, he brings his claim under 42 U.S.C. § 1983 (2006) and contends that the seizure "was without due process of law and in the absence of probable cause." (*Id.* ¶¶ 13-14.) In response, Burkhead denies the substance of Wright's claim and asserts the defense of qualified immunity. (Doc. No. 32, filed Feb. 26, 2008.)

After the close of discovery, Burkhead filed a Motion for Summary Judgment. (Doc. No. 39.) He argues that Wright has failed to show a deprivation of his constitutional rights and has failed to demonstrate that Burkhead violated clearly established law. (*Id.* at 1.) To support the Motion, Burkhead filed the transcript of his deposition, the transcript of the deposition of Wright, and his charging affidavit against Wright. (Doc. No. 41.) Wright opposes the Motion and filed an affidavit in support. (Doc. No. 44.)

### Standard of Review

In cases brought under Section 1983, review of a motion for summary judgment based on qualified immunity is somewhat different than in other cases. In deciding such motion, a court should "resolv[e] all issues of material fact in favor of Plaintiff[] and then answer[] the legal question of whether Defendant[] [is] entitled to qualified immunity under that version of the facts." *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *West v. Tillman*, 496 F.3d 1321, 1326 (11th Cir. 2007)). By construing the facts in this manner, the court has "the plaintiff's best

case in hand"; therefore, "material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity . . . ." *Id.* (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)). Thus, the court "determine[s] the legal issue of whether the defendant was entitled to qualified immunity using the version of facts most favorable to the plaintiff." *Bates*, 518 F.3d at 1239 (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

**Analysis**

**I.     The Law**

**A.     Qualified Immunity Generally**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "For a right to be 'clearly established,' previous case law must have developed it in a concrete factual context so as to make it obvious to a reasonable government actor that his actions violate federal law." *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1366 (11th Cir. 1998). As explained by the Eleventh Circuit Court of Appeals:

> The defense of qualified immunity represents a balance between the need for a damages remedy to protect the rights of citizens and the need for government officials to be able to carry out their discretionary functions without the fear of constant baseless litigation. The defense embodies an "objective reasonableness" standard, giving a government agent the benefit of the doubt unless her actions were so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed them.

*Id.* "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

Until recently, a court's analysis of qualified immunity involved a sequential, two-part inquiry. First, the court asked "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from by Pearson v. Callahan*, 129 S. Ct. 808, 818-22 (2009). If so, the court takes "the next, sequential step" which is "to ask whether the right was clearly established." *Id.* In January of this year, however, the United States Supreme Court held:

> On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

*Pearson*, 129 S. Ct. at 818.

If a court reaches the question of whether there has been a violation of clearly established rights, the court looks to only "the case[ ]law of the Supreme Court, the Eleventh Circuit or the law of the highest court of the state where the events took place." *Amnesty Int'l, USA v. Battle*, 559 F.3d 1170, 1184 (11th Cir. 2009) (citing *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001)). When looking to this precedent to determine whether a right is clearly established, "courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law." *Marsh*, 268 F.3d at 1031. The

Eleventh Circuit explained that the standard requires "clear warning that certain conduct in specific circumstances will violate federal law," and courts should "look at the facts in the precedent and at the facts that confronted the government official in the case before the court" and determine whether such facts are "materially similar." *Id.* at 1032. A precedent is "materially similar" when the factual circumstances facing the official at the time of the relevant incident "are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent." *Id.*

There is an exception to the material similarity requirement when the unlawfulness of the officer's conduct is obviously clear. *Id.* at 1031 n.9. This exception is rarely used and only applies in either extremely egregious cases or when the relevant legal rule is very specific. *Id.* As the Eleventh Circuit has explained:

> Especially where the applicable legal standard is a highly general one, such as "to act reasonably" or "to act with probable cause," preexisting case law, that has applied the general law to specific circumstances, will almost always be necessary to draw the bright line that is capable of honestly giving fair and clear notice that an official's conduct will violate federal law.

*Id.*

### B. Qualified Immunity in Cases Alleging False Arrest

The Eleventh Circuit has set forth in detail the proper analysis for claims of qualified immunity in cases in which the plaintiff makes a claim of false arrest:

> A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, but the existence of probable cause at the time of arrest constitutes an absolute bar to a section 1983 action for false arrest. If no constitutional right would have been violated were the allegations established,

there is no necessity for further inquiries concerning qualified immunity. Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.

If a constitutional violation occurred because the officer lacked probable cause, we next consider whether arguable probable cause existed. The officer may still be shielded from liability because his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition. Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed. Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest.

*Case*, 555 F.3d at 1326-27 (citations, quotation marks, and alterations omitted). In describing what is required to establish probable cause, the Eleventh Circuit stated that it "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 1327 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n.13 (1983)). Moreover, "[e]ven 'seemingly innocent activity' can be the basis for probable cause." *Id.* (quoting *Gates*, 462 U.S. at 245 n.13.) "Probable cause does not require overwhelmingly convincing evidence, but only reasonably trustworthy information." *Id.* (quotation marks omitted) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996)).

## II. Merits of Defendant's Motion

The parties do not dispute that Wright was sitting in his parked vehicle across the street from an undercover prostitution decoy operation for approximately thirty minutes. (Doc. No. 41-2 at 51, 59, 70.) The parties also do not dispute that Burkhead and Walker approached the parked vehicle on foot to question Wright about what he was doing there. (*Id.* at 50, 70-71; Doc. No. 41-3 at 19-20.) Viewing the facts in the light most favorable to Wright, Burkhead ordered Wright to roll down

his window and proceeded to question Wright about his identity and reason for being in the area. (Doc. No. 44-2 at 1, ¶ 3; *see also* Doc. No. 41-2 at 70; Doc. No. 41-3 at 19-20.) After less than a minute, Walker alerted Burkhead to the presence of a gun in the car, and Wright contends that Burkhead drew his weapon and ordered Wright out of the vehicle. (Doc. No. 41-2 at 70-71; Doc. No. 41-3 at 21, 66.) The parties do not dispute that Wright gave Burkhead a document which Wright claimed was a Georgia concealed firearm permit. (Doc. No. 41-2 at 66, 71; Doc. No. 41-3 at 24-25.) Burkhead and Walker reviewed the document but determined that it was either fake or invalid in Florida, and Burkhead arrested Wright for carrying a concealed firearm without a valid permit in violation of § 790.01(2), Florida Statutes. (Doc. No. 41-2 at 46, 71; Doc. No. 41-3 at 26, 44, 47; Doc. No. 41-4 at 1.) Given these facts, the Court must consider whether there was a violation of Wright's constitutional rights when: (1) Wright was approached in his parked vehicle and questioned by Burkhead and Walker; (2) Walker observed the firearm inside the vehicle, and Burkhead ordered Wright out of the car; and (3) Wright was placed under arrest. If there has been a constitutional violation, the Court must next consider whether the violation invades Wright's clearly established constitutional rights. If there has been no constitutional violation, however, the Court goes no further because Burkhead is entitled to qualified immunity.

### A. Propriety of Approaching and Questioning Wright

For purposes of Fourth Amendment analysis, there are "three broad categories of police-citizen encounters": "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006) (citing *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989)). The Eleventh Circuit has explained:

> The first category of consensual encounters does not implicate [F]ourth [A]mendment scrutiny. The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. In order to justify such a [F]ourth [A]mendment "seizure," the government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required.

*United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986) (citations omitted).

Encounters that do not involve coercion or detention do not implicate the Fourth Amendment. Thus, "[o]fficers are free, without any level of suspicion, to approach citizens on the street or in a public place and ask them questions, request proof of identification, and a consent to search." *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006) (citing *Espinosa-Guerra*, 805 F.2d at 1506). Moreover, "a police officer does not seize an individual merely by approaching a person in a parked car." *Id.* (citations omitted). A police encounter does not constitute a seizure "[i]f a reasonable person would feel free to terminate the encounter. . . ." *Perez*, 443 F.3d at 777-78 (quoting *United States v. Drayton*, 536 U.S. 194, 200-01 (2002)). To determine whether an encounter has become a seizure, that is, whether a reasonable person would feel free to leave, a court should consider the following factors:

> whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police.

*Id.* at 778 (quoting *United States v. De La Rosa*, 922 F.2d 675, 678 (11th Cir. 1991)).

In his affidavit, Wright states for the first time that the officers "ordered" him to roll down his window. (Doc. No. 44-2 at 1, ¶ 3.) He reiterates this point later in the affidavit, stating, "I did not consensually roll down my window for Deputy Burkhead but was ordered to do so." (*Id.* at 3,

¶ 7.) Assuming that this version of the facts presented by Wright is true, as the Court must at the summary judgment stage, the Court does not need to determine whether a reasonable person would have felt free to leave under these circumstances and therefore whether the Fourth Amendment is implicated, because even if Wright did not feel free to leave, the officers conducted a valid *Terry* stop.

A *Terry* stop, falling in the second category of police-citizen encounters previously described, is one which complies with the rule set forth by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). This rule provides that "if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information." *Hayes v. Florida*, 470 U.S. 811, 816 (1985) (citations omitted). The Eleventh Circuit has elaborated, "*Terry*, and the cases which have followed it, make clear that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (quotation marks omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The court has further explained:

> Law enforcement officers may detain a person briefly for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity. The reasonable suspicion must be more than an inchoate and unparticularized suspicion or hunch. Reasonable suspicion is determined from the totality of circumstances and collective knowledge of the officers. Whether reasonable suspicion existed at the time of the investigatory stop is a question of law to be determined ultimately by judges, not policemen. The question is not whether a specific arresting officer actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify such a search.

*United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (citations, quotation marks, and alterations omitted). Significantly, "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *Gordon*, 231 F.3d at 754.

In the instant case, Wright was driving down South Orange Blossom Trail at approximately 8:00 in the evening. (Doc. No. 41-2 at 50, 55.) He pulled into a lot off the street across from a strip club, turned off his lights, and parked. (Doc. No. 41-3 at 19, 62.) The OCSO was conducting a prostitution decoy operation across the street from Wright's vehicle. (*Id.* at 18-19.) Wright remained in the dark, parked vehicle for approximately thirty minutes. (*Id.*; Doc. No. 41-2 at 51, 59, 70.) At that point, the undercover female officer posing as a prostitute alerted her safety officer to the presence of a suspicious person. (Doc. No. 41-3 at 19.) The safety officer alerted Walker, and Burkhead and Walker went over to Wright's vehicle to investigate. (*Id.* at 19-20.) Considering the totality of the circumstances because of the sensitive and covert nature of the prostitution decoy operation, the legitimate concern for the safety of the undercover female officer, and Wright's suspicious behavior, a law enforcement officer in Burkhead's position would have a reasonable suspicion that criminal activity was afoot.[4] Therefore, Burkhead was justified in approaching Wright's car and briefly questioning Wright.

---

[4] For example, an officer could have a reasonable suspicion that Wright was violating Florida's anti-loitering statute, among others. The elements of the offense of loitering are: "(1) the accused must be loitering or prowling at a place, at a time, or in a manner not usual for law-abiding citizens; and (2) the loitering or prowling must be under circumstances that warrant a reasonable fear for the safety of persons or property in the vicinity." *Gordon*, 231 F.3d at 758 (citing § 856.021(1), Fla. Stat.). An officer could reasonably suspect that this offense was being committed because Wright was parked in the dark with his lights turned off for an extended period of time across the street from an undercover police operation. (Doc. No. 41-3 at 19.) Concern for the safety of he female undercover officer posing as a prostitute was relayed to Walker who asked Burkhead to accompany him to Wright's vehicle to determine whether Wright in fact posed a security risk. (*Id.* at 19-20.)

### B. Propriety of Conduct During Stop

When law enforcement officers perform *Terry* stops, they are "authorized to take such steps as [a]re reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). In addition, officers are "entitled to seize evidence revealed in plain view in the course of the lawful stop" and to arrest passengers of a motor vehicle "when evidence discovered in plain view [gives] probable cause to believe the passenger[s] ha[ve] committed a crime . . . ." *Id.* (citing *Texas v. Brown*, 460 U.S. 730 (1983)). As the former Fifth Circuit Court of Appeals[5] found, "A car is not a home. An automobile runs and stops on the public roads, where viewers may crawl under it or press their faces against its windows. Its exterior and much of its interior are within the 'plain view' of the casual or purposeful onlooker, and thus are not protected by the Fourth Amendment from searching eyes." *United States v. Polk*, 433 F.2d 644, 647 (5th Cir. 1970); *see also United States v. Woods*, 560 F.2d 660, 669 (5th Cir. 1977) ("The plain view doctrine permits law enforcement officers the full use of their eyes in places the officers have a right to be."); *United States v. McDaniel*, 550 F.2d 214, 218 (5th Cir. 1977) ("The plain view doctrine applies to articles which can be seen through the door or window of an automobile." (citing *Nunez v. United States*, 370 F.2d 538 (5th Cir. 1967))).

It is undisputed that Walker observed a handgun in Wright's vehicle through the car window. As Wright testified during his deposition, "The officer on the passenger side saw I had my gun on the floorboard of the – of the Explorer in plain view, I would say, if he saw it." (Doc. No. 41-2 at 50.) Upon further questioning about the location of the firearm, Wright agreed that "[i]t was in the

---

[5] The Eleventh Circuit Court of Appeals adopted as binding precedent all prior decisions of the former Fifth Circuit Court of Appeals issued prior to October 1, 1981. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

middle, between the two seats" in the "[c]enter console" area "[o]n the floor." (*Id.* at 61-62.) He continued, "It's right there in between the driver's and the passenger's seat, forward but down." (*Id.* at 63.) Later, Wright was asked about the visibility through the windows of his vehicle:

> Q. If the windows are rolled up, can someone see inside the car?
>
> A. Yes, even at night. That's how the officer on the passenger side was able to look in and see [the gun] on the console.

(*Id.* at 100-01.) Based on these statements by Wright, his firearm was located in his vehicle in open view and could be seen from outside of the car. Walker's observation of the firearm through the window did not constitute a "search" of the vehicle, and even if it did, the search was a permissible security precaution during a lawful *Terry* stop. *E.g.*, *Hensley*, 469 U.S. at 235.

### C. Propriety of Arrest

Once Walker observed the firearm and located its presence, Burkhead ordered Wright out of the car and detained him. After Wright was in handcuffs, Burkhead returned to Wright's vehicle to secure the firearm. Burkhead described the location of the gun in the vehicle:

> Q. After Mr. Wright got out of the vehicle you then went to look for the gun because of the alert by Sergeant Walker?
>
> A. Yes.
>
> Q. And where did you find the gun?
>
> A. Underneath the driver's seat.
>
> Q. And how did you find the gun? Was it out of the holster, in the holster, what form was it?
>
> A. It was – the butt of the gun or handle, whatever you want to call it, it was towards where the driver – whoever would be in the car comport this way. So it was facing, the barrel was facing towards the back of the vehicle. It was laying on the floor. It was loosely in a holster, and if you looked straight down you might not have seen it, but it was sticking out. You know how the

  seat kind of curves a little bit? It was laying directly on the floor flat, right underneath the seat.

Q.  Was it closer to the left side or the right side of the driver?

A.  I would say it was probably right in the middle.

Q.  Okay. Would it be accessible if the driver were to reach down and grab it?

A.  Definitely.

Q.  Do you recall if the holster was locked or snapped?

A.  No, it was loose in the holster.

Q.  Do you recall if it was loaded?

A.  It was loaded.

Q.  Do you recall if there was a round in the chamber?

A.  Yes, there was.

Q.  So not only was the magazine loaded, but there was a round in the chamber?

A.  Yes.

(Doc. No. 41-3 at 64-65.) This testimony was not contracted by Wright; in fact, Wright admitted that his gun was loaded and stated that he usually did not keep the safety on. (Doc. No. 41-2 at 64-65.)

  The relevant question is whether, based on these facts, it was reasonable for Burkhead to conclude that there was probable cause, or at least arguable probable cause, to arrest Wright. Burkhead asserts that this standard is met as to the charged offense of carrying a concealed weapon without a valid license in violation of § 790.01(2), Florida Statutes, as well as to the offense of open possession of a firearm in violation of § 790.053(1), Florida Statutes. The fact that Wright was not charged with open possession has no bearing on the Court's analysis because qualified immunity

is based on an objective standard; therefore, the subjective intent of the arresting officer is irrelevant. *Lee*, 284 F.3d at 1195-96. "Indeed, when an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *Id.* at 1196 (quotation marks and alteration omitted) (quoting *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973)).

The standard for probable cause "is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Lee*, 284 F.3d at 1195 (quotation marks omitted) (quoting *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998)). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." *Id.* (quotation marks and alteration omitted) (quoting *Scarbrough v. Myles*, 245 F.3d 1299, 1302 (11th Cir. 2001)).

Whether there was probable cause to arrest Wright for carrying a concealed weapon after Wright presented Burkhead with an out-of-state concealed weapon permit is a more complicated question than whether probable cause existed to arrest Wright for openly carrying a weapon. Because qualified immunity applies if probable cause existed for either offense, the Court will first consider whether the simpler question determines the issue; that is, whether probable cause existed to arrest Wright for openly carrying a weapon.

The relevant statute provides that "it is unlawful for any person to openly carry on or about his or her person any firearm or electric weapon or device." § 790.053(1), Fla. Stat. There are

-17-

certain exceptions to this provision, such as when a person carries a firearm while lawfully engaging in, going to, or returning from a hunting expedition or target shooting. *Id.* § 790.25(3). Because it is Wright's burden to demonstrate that qualified immunity does not apply, *Lee*, 284 F.3d at 1194, he must show that no probable cause existed to believe he was committing the offense of openly carrying a firearm. Wright could have met this burden by demonstrating that one of the statutory exceptions was applicable. *See* § 790.25(3), Fla. Stat. However, Wright has neither argued nor presented any evidence that he was participating in any of the excepted activities. (*See* Doc. Nos. 44, 44-2.) To the contrary, Wright testified that he was driving from the Florida Mall to his girlfriend's house when he stopped to call some friends to ask if they wanted to go to Cleo's Night Club with him. (Doc. No. 41-2 at 45, 50, 55-56.) According to Wright, his firearm was located on the center console, easily viewable through the window from outside of the vehicle. (*Id.* at 50, 60-63.) Burkhead described the firearm as being loaded, readily accessible to Wright in the driver's seat, and placed loosely in a holster but not otherwise secured. (Doc. No. 41-3 at 64-65.) Based on these facts, a reasonably prudent officer would believe that Wright was openly possessing a firearm in violation of § 790.053(1) of the Florida Statutes. Because probable cause existed, Burkhead did not violate the Fourth Amendment by arresting Wright. *Lee*, 284 F.3d at 1194-95 (quoting *Atwater v. City of Lago Vista, Tex.*, 532 U.S. 318, 354 (2001)). There being no constitutional violation, Burkhead is entitled to qualified immunity.

## Conclusion

Based on the foregoing, the Motion for Summary Judgment by Defendant Duane S. Burkhead (Doc. No. 39, filed Mar. 12, 2009) is **GRANTED**. The Clerk of the Court shall enter judgment in favor of Defendant Burkhead and shall close the case.

**DONE** and **ORDERED** in Orlando, Florida on May 16 , 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record